## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. | **CHRISTOPHER PLEIMANN,** | ) |
| | | ) |
| | **Plaintiff,** | ) |
| **v.** | | )    **CIV-25-** |
| | | ) |
| 1. | **AMAZON.COM SERVICES** | ) |
| | **LLC, and** | ) |
| 2. | **AMAZON.COM, INC.,** | ) |
| | | )    **JURY TRIAL DEMANDED** |
| | **Defendants.** | )    **ATTORNEY'S LIEN CLAIMED** |

## COMPLAINT

**COMES NOW** the Plaintiff, Christopher Pleimann, and for his Complaint against the

Defendants, alleges and states as follows:

## PARTIES

1.      Plaintiff, Christopher Pleimann, is an adult male, residing in Canadian County,

Oklahoma.

2.      Defendants are:

a.      Amazon.Com Services, LLC, an entity doing business in and around

Oklahoma County, Oklahoma; and

b.      Amazon.Com, Inc., an entity doing business in and around Oklahoma

County, Oklahoma.

## JURISDICTION AND VENUE

3.      This cause of action arises out of Plaintiff's former employment with

Defendants and is based on the following claims: (a) race discrimination in violation of 42 U.S.C. §1981; (b) race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); and (c) gender discrimination in violation of Title VII.

4.    Jurisdiction over Plaintiff's federal causes of action is vested in this Court under 28 U.S.C. § 1331.

5.    Plaintiff has exhausted his administrative remedies as to the above-listed claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about January 2, 2025. The EEOC issued a right to sue letter dated April 3, 2025, which Plaintiff received thereafter. Plaintiff has timely filed this action within ninety (90) days of his receipt of the notice of right to sue.

6.    All acts complained of herein occurred in or around Oklahoma County, Oklahoma. Oklahoma County is located within the Western District of the United States District Court of Oklahoma.  Thus, venue is proper in this Court under 28 U.S.C. §1391(b).

## STATEMENT OF FACTS

7.    Plaintiff, Christopher Pleimann, a White male, was employed with Defendants for over ten (10) years, from on or about April 20, 2014, until on or about October 28, 2024.

8.    He was initially hired as a Seasonal Associate, but soon promoted into various promotions.  His last position was Transportation Operation Manager, which Plaintiff successfully held for over two (2) years.

9.    Throughout his employment, Plaintiff was recognized as an outstanding

employee. In addition to his multiple promotions, he also served on the Diversity, Equity and Inclusion ("DEI") team and had unionization management response responsibilities.

10.     Plaintiff received positive performance evaluations, merit-based increases, and was not written up. He was also highly regarded by his supervisor, peers and subordinates, being described as *inter alia*:

- An "outstanding leader, always displaying himself in a manner that is well above reproach"
- A "top performer"
- An individual who "exceeds company expectations" and "goes the extra mile"
- "Always do[ing] the right thing"
- Showing a "commitment to excellence and high standards"
- "[R]ais[ing] the bar on how managers should behave"
- A "standout leader"
- Showing "respect for anyone he is around"
- Embodying "the good qualities of working for Amazon"
- Bringing a "positive culture to the work environment"
- Fostering "positive relationships within diverse groups"
- Demonstrating "kindness, respect and [an] open-minded approach"
- Showing "commitment to inclusivity and understanding"
- Creating "a safe and welcoming environment"
- Exemplifying "qualities that all leaders should aspire to have"

11.     On or about January 29-31, 2024, Plaintiff participated in a unionization response training in Dallas, Texas attended by select managers, during which role play sessions were utilized to train managers in handling various real-world scenarios with which they might be presented by subordinate employees.

12.      An HR Representative, Tiffany Blagmon, selected Plaintiff to participate in a role play event, where Plaintiff was assigned to act as a manager in a scenario, and

Blagmon acted as a disgruntled employee.

13. During the scenario, Ms. Blagmon (a Black female) stated to Plaintiff, "Black lives matter, White lives don't, what are you going to do about it, White boy?"

14. Ms. Blagmon did not suffer any repercussion for her comments.

15. On or about September 10-12, 2024, Plaintiff attended a mandatory (L-6 manager and above) training summit in Phoenix, Arizona.

16. On the last day, Plaintiff attended a training session regarding unionization and how to respond to difficult situations that may arise among non-management staff.

17. Selected attendees were asked to participate in role play scenarios with one participant acting as an hourly employee raising an issue, and the other participant acting as the manager who would be tasked with attempting to de-escalate the situation.

18. Like the January 2024 training, participants were told by the facilitator (a senior HR leader) that the role plays were a safe-space to raise difficult issues and designed to push leaders outside their comfort zone in order to learn new leadership techniques.

19. Also like the January 2024 training, once the role play scenarios were complete, the group engaged in open discussion about how it might have been handled differently.

20. Plaintiff was selected by the session facilitator to participate in one of the role-play scenarios, where he was tasked with playing the part of a disgruntled, hourly employee seeking a pay raise from a senior leader.

4

21.     One of Plaintiff's peers, De'quan McDowell, was tasked with playing the role of the senior leader.

22.     In his assigned acting role of a disgruntled hourly employee, Plaintiff stated that he wanted more money and asked what the other actor was going to do about it because Christmas is coming up, using a term like rich boy as part of the acting scene.

23.     Mr. McDowell, acting as the senior leader, stated that he appreciated the issue being brought to his attention and that he would look into the matter.

24.     At the end of the role-play, the group laughed and light-heartedly discussed the scenario, offering feedback about Mr. McDowell's response to the pretend disgruntled employee.

25.     As part of the question-and-answer feedback session, an attendee inquired as to whether a manager should take the disgruntled employee's "boy" comment as a racist comment.

26.     The session facilitator stated that if any racial issues arose in the workplace, employees could contact ERC, which handles such issues.

27.     Several weeks later, on or about September 23, 2024, Plaintiff received an email about speaking with a HR representative, to which Plaintiff promptly responded and scheduled a phone meeting for the next day.

28.     During the September 24, 2024 phone call, the HR Representative claimed an allegation had been made against Plaintiff related to the Arizona training session. Plaintiff

provided a detailed accounting of the events.

29.    Over one month later, on or about October 28, 2024, Plaintiff was notified of his termination by Human Resources and received a termination letter thereafter.

30.    The letter did not state any reason for termination.

31.    Upon information and belief, Senior HR Leader Kathy DeSpagna (female), who was present during the training session, was involved in Plaintiff's termination decision.

32.    After Plaintiff's wrongful termination, numerous employees wrote statements on his behalf, attesting to his character, leadership and outstanding performance, and asking that he be reinstated.

33.    Despite this, Plaintiff was informed that the termination decision would not be overturned.

34.    Defendants have a history of discriminating against White male employees.

35.    By way of example, during Plaintiff's employment, White male employees were subject to more stringent work standards than their similarly situated co-workers who were not White and/or female.

36.    Racial comments and epithets made by Black employees in the workplace were regularly overlooked, whereas, White employees who were reported as having made comments perceived as race-related were terminated.

37.    On one occasion, two Black employees were referring to one another as "n*****." Another employee, who was White, overheard the comments and remarked that

he did not understand the Black employees using "the n word."  The White employee was terminated for using the phrase: "the n word."  Yet, the Black employees were not terminated for their overtly racist language, actually using and referring to one another by the non-abbreviated version of the "n word."

38.    On another occasion, a Black female manager who held the same position as Plaintiff used overtly racist remarks towards subordinates in the workplace.  The subordinates complained and initially a decision was made to fire the Black female manager as a result of her confirmed race-based comments.  Yet, after complaining about her termination, she was rehired. An HR representative told Plaintiff the reason for the rehire was because "Black females make a lot of noise."

39.    Additionally, another Black manager frequently used racist language and engaged in sexual discussion with his subordinates, saying "White b**ches will do anything" in a sexual context.  Yet, the Black manager did not suffer any repercussion for his comments.

40.    Defendants also engaged in discriminatory hiring and promotional practices.

41.    On one occasion, a Black individual was hired in a manager role who had less experience as compared to other non-minority candidates, but Plaintiff was told the individual was hired because Defendants (with a DEI policy) "needed to meet quota."

42.    Moreover, in the course of his employment, Plaintiff served as a hiring manager. In such capacity, Plaintiff and other managers would collectively conduct

interviews and recommend the most qualified applicant for hire.

43. Frequently, however, HR would override the team's recommendation and hire a minority and/or female applicant.

44. During training sessions for hiring managers, Plaintiff and other trainees were also subtly given directives to hire minority and/or female employees, being told to remember that women and "people of color" matter.

45. As a direct and proximate result of Defendants' actions, Plaintiff suffered injuries described hereafter.

### COUNT I: 42 U.S.C. §1981

For his first cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

46. The matters alleged above constitute race discrimination in violation of 42 U.S.C. §1981.

47. Plaintiff is entitled to relief because Defendants are one of those unusual employers who discriminate against the majority race; Plaintiff was qualified for his job; he was terminated from his employment; and his job was not eliminated.

48. As damages, Plaintiff has suffered lost earnings, past and future, emotional distress and other equitable and compensatory damages allowed by the Civil Rights Act of 1991.

49. Because the actions of Defendants were willful, wanton, or at the least, in

reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages as provided by the Civil Rights Act of 1991.

## COUNT II: TITLE VII (RACE)

For his second cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

50.    The matters alleged above constitute race discrimination in violation of Title VII.

51.    Plaintiff is entitled to relief because Defendants are one of those unusual employers who discriminate against the majority race; Plaintiff was qualified for his job; he was terminated from his employment; and his job was not eliminated.

52.    As damages, Plaintiff has suffered lost income, past and future, emotional distress and other equitable and compensatory damages allowed by the Civil Rights Act of 1991.

53.    Because the actions of Defendants were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages.

## COUNT III: TITLE VII (GENDER)

For his third  cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

54.    The matters alleged above constitute gender discrimination in violation of Title VII.

55.     Plaintiff is entitled to relief under Title VII because Defendants are one of those unusual employers who discriminate against the majority; Plaintiff was qualified for his job; he was terminated from his employment, and his job was not eliminated.

56.     As damages, Plaintiff has suffered lost earnings, past and future, emotional distress and other equitable and compensatory damages allowed by law.

57.     Because the actions of Defendants were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages.

<u>**REQUEST FOR RELIEF**</u>

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in favor of the Plaintiff and against the Defendants and award actual damages, compensatory damages, back pay, front pay, emotional distress damages, punitive damages, together with any appropriate equitable relief, pre- and post-judgment interest, costs and attorney's fees and other such relief under law as this Court may deem equitable and appropriate.

**RESPECTFULLY SUBMITTED THIS 11TH DAY OF JUNE, 2025.**

> **s/Jana B. Leonard**
> **JANA B. LEONARD, OBA# 17844**
> **SHANNON C. HAUPT, OBA #18922**
> **LEONARD & ASSOCIATES, P.L.L.C.**
> **8265 S. WALKER**
> **OKLAHOMA CITY, OK 73139**
> **(405) 239-3800     (telephone)**
> **(405) 239-3801     (facsimile)**
> **leonardjb@leonardlaw.net**
> **haupts@leonardlaw.net**
> **JURY TRIAL DEMANDED**
> **ATTORNEY LIEN CLAIMED**